**Philip A. YOUNG, et al.**

v.

**STANDARD OIL (INDIANA),
Amoco Oil Company.**

**No. IP 83–1751–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 27, 1987.

Phillip Greene Decker, Decker & Lawyer, Anderson, Ind., for plaintiffs.

Charles E. Bruess, Barnes & Thornburg, Indianapolis, Ind., for defendants.

## ORDER

STECKLER, District Judge.

This matter is before the Court upon the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. This rule states, in part, that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). In ruling on a summary judgment motion, the district court must examine the evidence in the light most favorable to the nonmoving party by drawing all reasonable inferences in favor of that party. *See United States Shoe Corp. v. Hackett,* 793 F.2d 161, 166 (7th Cir.1986); *Black v. Henry Pratt Co.,* 778 F.2d 1278, 1281 (7th Cir.1985). The Court heard arguments on defendants' motion on April 16, 1987. The Court, having examined the mo-

tion, the memorandums of law, the affidavits and other exhibits, now finds there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. The Court now enters the following findings of fact and conclusions of law.

### Findings of Fact

1. The nine named plaintiffs are former employees of the defendant Amoco Oil Company ("Amoco"). The plaintiffs were employed in the portion of Amoco's Fertilizer & Pesticides Division ("F & P Division") that was sold to The Cropmate Company ("Cropmate") in 1983. At all material times, Amoco was a wholly-owned subsidiary of defendant Standard Oil Company (Indiana) ("Standard").

2. For a number of years prior to 1983, Amoco owned and operated the F & P Division, which was responsible for raw materials acquisition, manufacture, primary distribution, terminaling, marketing and farm delivery and application of fluid agricultural fertilizers and crop protection materials. The Division had facilities in fourteen states although the bulk of these were in the Midwest. Included in the Division were more than 350 retail fertilizer outlets, fourteen fertilizer processing (mix) plants, six ammonia terminals, four soil laboratories, Torch Chemical (which operated seven agricultural chemical distributorships), Trekker Chemical (which operated a manufacturing/formulation plant producing specialty fertilizer additives and agricultural pesticides) and over 800 employees.

3. The retail outlets in the F & P Division were organized into three districts as follows:

| District | State | Number of Outlets |
| --- | --- | --- |
| East | Wisconsin | 11 |
| | Illinois | 87 |
| | Indiana | 38 |
| | Ohio | 20 |
| | Michigan | 6 |
| West | Minnesota | 32 |
| | Iowa | 91 |
| | Missouri | 28 |
| | Kansas | 1 |
| | Nebraska | 3 |
| South | Georgia | 36 |
| | Florida | 1 |
| | Alabama | 1 |
| | Louisiana | 1 |
| | | 356 |

4. Each of the retail outlets was managed by one F & P employee called the "crop guide manager." A number of these retail outlets also had a second full-time employee called a "helper" or "secondman." The named plaintiffs in this action were each employed in the retail outlets as follows:

| Plaintiff | Position | Location |
| --- | --- | --- |
| Philip A. Young | Crop Guide Manager | Markelville, IN |
| Max Gossard | Crop Guide Manager | Sheridan, IN |
| Robert L. Broeker | Crop Guide Manager | Culver, IN |
| Mark Bokelman | Helper | Sandusky, IN |
| James Rohlf | Crop Guide Manager | Green Springs, OH |

| Plaintiff | Position | Location |
|---|---|---|
| Oliver E. Moldestad | Crop Guide Manager | Delhi, MN |
| Larry Godejahn | Crop Guide Manager | Hector, MN |
| Emery Pistulka | Crop Guide Manager | Wabasso, MN |
| Arthur Reinsma | Crop Guide Manager | Slayton, MN |

5. In 1982, Amoco decided to try to divest the F & P Division. Initially, Amoco wanted to sell the entire Division as an on-going concern, and the investment banking firm of Morgan Stanley & Co. was employed to seek a buyer for the business. However, following a lack of significant response to an offering memorandum that was provided to prospective purchasers, Morgan Stanley recommended on June 15, 1982, that Amoco proceed with any feasible divestment plans.

6. Thereafter, on June 24, 1982, an Amoco Vice President recommended that Amoco drop fertilizers and pesticides as a line of business and cease all domestic retail fertilizer and pesticide operations as soon as practical but not later than June 30, 1983. On July 19, 1982, Amoco's Management Committee considered and approved a proposal to divest the F & P Division and withdraw from the business. The proposal was (1) to sell the business as an entity if possible; (2) to sell the business in pieces if sale as an entity was not possible; and (3) if sales were not possible, to shut down the operations. Standard's Management Committee approved the proposal on July 20, 1982.

7. Over a period of several years prior to 1981, Standard and its subsidiaries had implemented a number of different severance policies. Effective April 1, 1981, however, Standard had adopted the Severance Allowance Policy of Standard Oil Company and Participating Companies (the "1981 Severance Policy"). The 1981 Severance Policy provided that it would apply to a company "whose management elects to apply [it] to a particular employee-reduction situation," and that it could "be implemented for a particular employee-reduction situation for a limited period of time." The 1981 Severance Policy also conferred authority on management to designate categories of employees who would not be eligible to participate in situations where the Policy was otherwise implemented. The 1981 Severance Policy further provided that:

3. Even though the Policy may be in effect for a particular employee-reduction situation, an employee will not qualify for a severance allowance under the following circumstances:

g. Sale of facilities when the new owner offers to the employee comparable employment as determined by the Company.

The 1981 Severance Policy was reported to the United States Department of Labor by letter dated November 3, 1981.

8. During 1982, when divestiture of the F & P Division was initially being considered, Amoco's management also began considering the possible implementation of the 1981 Severance Policy in connection with such a divestiture. Thereafter, in June 1982, after Amoco's management preliminarily decided to cease all F & P operations, the process for obtaining formal approval to implement severance under the 1981 Severance Policy was begun. On July 13, 1982, management approval was granted to implement severance under the 1981 Severance Policy for all F & P Division employees, including the crop guide managers and other retail plant employees.

9. On August 2, 1982, however, after Standard's approval of the final Amoco proposal to divest the F & P Division (which included selling and shutting down the Division in pieces if sale as an entity was not possible), L.D. Thomas, President of Amoco, sought permission from Standard to create a different severance policy to govern the F & P divestiture. Thomas's memorandum stated, *inter alia*, that:

The Severance Allowance Policy currently in effect states that severance will not be payable if "the new owner offers to the employees comparable employment as determined by the company." Be-

cause of the nature of the fertilizer and pesticides business, it is unlikely that potential buyers would provide wages or the level of benefits comparable to those presently offered by Amoco Oil. Under these conditions, all present Fertilizer & Pesticides employees would probably qualify for severance benefits, regardless of employment opportunities with the new owners. Such payments would amount to approximately $6,200,000. In addition, it is conceivable that many different new owners will be involved, making it difficult to determine comparable employment and inviting possible litigation in the determination of comparable employment.

Amoco Oil recommends that a special Severance Allowance Policy be adopted for the Fertilizer & Pesticides divestiture as follows:

1. Any present Amoco employee who is offered a position with a new owner will forfeit severance consideration, regardless of salary, benefits, or position.

2. Severance payments will be given to current employees who are not offered employment with the new owner, and to employees when facilities are not sold and operations are discontinued.

3. Consent Retirement will be available to current employees with 20 or more years of Retirement Plan participation even if they do not qualify for a severance allowance.

10. Standard approved this recommendation to adopt a special severance policy for the divestiture of the F & P Division and confirmed this by letter dated August 6, 1982. Accordingly, the Severance Allowance Policy of the Fertilizer & Pesticides Division of Amoco Oil Company ("F & P Severance Policy") was created, effective August 1, 1982. It provides, *inter alia*, that:

This policy applies to employees in the Fertilizer & Pesticides operations of Amoco Oil Company whose services are permanently terminated due to the discontinuance or sale of such operations.

. . . .

B. Qualifications—Severance Allowance

1. An employee will qualify for a severance allowance provided all of the following conditions are met:

a. The employee becomes unemployed because:

(1) The Company does not sell the facility and the operations are discontinued, or

(2) The facility is sold by the Company but the buyer does not offer employment to the individual.

. . . .

2. An employee will not qualify for a severance allowance under the following circumstances:

a. Offered a job by the new owner of the facility.

The F & P Severance Policy was reported to the United States Department of Labor by letter dated February 24, 1984.

11. By letter dated August 3, 1982, addressed to all employees of the Division, Amoco confirmed a potential sale of the Division and stated the qualification for entitlement to severance pay:

Amoco Oil Company will announce publicly tomorrow that it plans to offer for sale its entire fertilizer and pesticides marketing and supply system. . . .

Amoco has explored sale of the entire fertilizer and pesticide system with several large companies and currently has negotiations underway with interested parties. Barring sale of the system as a whole, Amoco plans to sell the system in regional segments, possibly to regional companies with growth plans. . . .

If the system is sold as a whole or in regional segment, current employees may be offered employment by the purchaser. Should such sales not occur or employees are not offered employment by the new owners, Amoco will provide severance and if eligible, retirement benefits to regular full-time employees who must leave the company.

12. Amoco also distributed to its employees a press release, dated August 4, 1982, which also described the divestiture

and the conditions under which severance benefits would be paid. The press release stated in part: "Amoco will provide severance and appropriate retirement benefits to regular, full-time employees who are not offered employment by the new owners and must leave the company because of the sale."

13. In addition, in August 1982, the Division employees were provided copies of "Questions and Answers About Fertilizer and Pesticides Sale." The document stated, *inter alia:*

3. Does this mean that the Fertilizer & Pesticides facilities will be shut down? Answer: Finding a suitable purchaser for a business this large requires a lot of time and effort. Active, profitable fertilizer and pesticides operations will not be shut down at this time. Ultimately, we plan to get out of the business.

....

6. Should a purchaser for the system, or parts of it, be found and the purchaser offered Amoco Oil employees jobs, would Amoco Oil provide the regular full-time employees with severance? Answer: If a purchaser is found and elects to hire Amoco Oil's current regular, full-time employees, they would not be eligible for severance pay.

7. If I reject a job offer from the new owner, will I forfeit my severance benefits? Answer: Yes. Severance benefits will be available only to regular, full-time employees who are not offered a job.

14. The plaintiffs each received copies of one or more of the aforementioned documents, and each of them received a copy of the aforementioned "Questions and Answers."

15. After further efforts to sell the F & P Division as an entity were unsuccessful, Amoco began selling and shutting down the Division in regional segments. In early 1983, Amoco (1) sold the mix plant in Rochelle, Georgia, to Chemical Enterprises, Inc., and sold or shut down the retail plants in Georgia; (2) sold the Brunswick, Missouri, mix plant and all retail plants in Missouri and Kansas to SCF, Inc.; and (3) sold the mix plant at Mt. Carmel, Illinois, and the retail plants served by that facility (thirteen in Illinois and seven in Indiana) to Triple T, Inc. Lawsuits seeking severance benefits were brought against Amoco arising out of the same F & P Severance Policy and the plant sales in Rochelle, Georgia and Mt. Carmel, Illinois. These lawsuits were adjudicated on the merits and in favor of Amoco. *Hall v. Amoco Oil Company,* CA No. 83–40–Amer (N.D.Ga.1985); *Wills v. Amoco Oil Co.,* CV No. 84–4434 (S.D.Ill. 1985) [Available on WESTLAW, DCT database].

16. Amoco thereafter received an offer for the remainder of the F & P Division from the Scoular Company. Scoular's offer said, *inter alia,* that:

Most of the retail outlets will be offered for sale to the present AMOCO plant managers at 82.5% of net book value. The retail outlets will be leased back under long term agreements.

Most of AMOCO's employees, including the owner-manager of the leased retail outlets, will be offered comparable jobs.

By letter to Scoular dated May 13, 1983, Amoco confirmed a tentative agreement to sell the remainder of the F & P Division to Scoular. Amoco told the F & P employees of the tentative sale to Scoular by letter dated May 19, 1983.

17. The final Agreement for Sale and Purchase of Assets was made as of June 15, 1983, between Amoco Oil Company, as Seller, The Cropmate Company (a subsidiary created by Scoular), as Buyer, and The Scoular Company. The Agreement provided for the purchase by Cropmate of all of the remaining assets used by Amoco for the F & P business. The Agreement further provided that:

3.4 *Employees of Seller*

(a) ... Buyer agrees to offer employment prior to closing (August 31, 1983) to each employee of Seller listed in Exhibit "U" upon the following terms and conditions: pre-employment physical examinations shall be waived and substantially equivalent employee salaries will

begin as of the closing. Exhibit "U" shall be completed by Buyer prior to July 20, 1983.

(b) Buyer shall recognize prior service with Seller for vesting of those employees listed on Exhibit "U" who participate in Buyer's profit sharing plan.

18. By letter dated June 20, 1983, Amoco told the remaining F & P employees of the sale to Cropmate and stated, *inter alia,* that:

The agreement stipulates that the effective date of employment for those employees who are offered and accept employment with The Cropmate Company will be September 1, 1983.

. . . .

Please contact your immediate supervisor if you have questions regarding the transition. Questions concerning your Amoco Oil benefits should be directed to Lucy Wilcox (312) 789–4934 or Sharon Zorn (312) 789–4966.

This letter was sent to the plaintiffs.

19. Scoular's intention, as communicated to Amoco in its offer-to-purchase letter, was that jobs would be offered to most of the F & P employees, and that most crop guide managers would also be encouraged to purchase from and lease back to Cropmate the retail outlets where they were employed. After the sale agreement between Amoco, Scoular and Cropmate was made, Cropmate began reviewing the current crop guide managers to determine which ones Cropmate wanted to become part of the new organization. Those current crop guide managers and certain current helpers that Cropmate wanted to become crop guide managers for Cropmate were invited to meetings during July 1983. Each of the named plaintiffs attended such a meeting between July 11 and July 17, 1983. There are disputed factual issues regarding what was said at these meetings about employment with Cropmate and Cropmate's proposal that crop guide managers purchase from and lease back to Cropmate their retail outlets, and whether these proposed transactions would be beneficial to the plaintiffs. However, the following facts are undisputed:

(a) Pursuant to the sale agreement, Cropmate provided to Amoco a list of current employees to whom Cropmate would offer jobs. Each of the nine plaintiffs was named on that list.

(b) Eight of the nine plaintiffs were in fact employed by Cropmate beginning the day after the sale was closed, each in the same job and at the same salary.

(c) Cropmate twice told Amoco after the sale closing that the remaining plaintiff (Moldestad) had been offered and had refused a job with Cropmate.

20. Later in July 1983, Amoco held benefit meetings with the F & P employees. Each of the named plaintiffs attended one of these meetings. At these meetings, the F & P employees were again told that an employee who was offered a job by the purchaser would not be eligible for severance pay. The employees were also told how the amount of severance would be computed for eligible employees.

21. The closing of the sale between Amoco, Scoular, and Cropmate was held on August 31, 1983, and the sale was effective at 12:01 a.m. on September 1, 1983. All of the plaintiffs except Moldestad became employees of Cropmate on September 1, 1983, in the same positions and at the same salary.

22. As of the dates of their depositions in this action, six of the plaintiffs were still employed by Cropmate. These were:

| Plaintiff | Date of Deposition |
| --- | --- |
| Bokelman | 2/22/84 |
| Godejahn | 4/3/85 |
| Gossard | 2/23/84 |
| Pistulka | 4/2/85 |
| Reinsma | 4/2/85 |
| Rohlf | 3/8/85 |

23. On August 31, 1983, plaintiff Young notified Cropmate that he would work for Cropmate only until September 16, 1983. Young quit on that day and accepted a position with Terra Chemicals. He was paid by Cropmate for these two weeks.

24. Plaintiff Broeker remained employed by Cropmate until January 29, 1984. He testified at his deposition that he left when Cropmate found a potential manager-

buyer for his retail plant, and that he began farming full time.

25. After they began employment with Cropmate, three of the plaintiffs purchased their retail plants from and leased them back to Cropmate. These were:

| Plaintiff | Date of Purchase & Lease |
|---|---|
| Rohlf | November 1983 |
| Reinsma | February 1984 |
| Godejahn | April 1984 |

26. Cropmate terminated no one who did not want to buy a plant as of September 1, 1983. However, crop guide managers who did not buy their plants were at risk that Cropmate would later sell the plant to another buyer who would decide not to retain the existing manager.

27. Amoco employees were periodically sent booklets which detailed and explained their employee benefits. These benefit booklets do not mention severance benefits. However, they do describe the procedure and address for filing a benefit claim with Amoco. In addition, by letter dated July 14, 1983, the F & P employees were provided a booklet summarizing their benefits upon termination of their employment. These booklets did not say anything about severance. However, they do state that:

> After your termination, you should direct all benefit plan questions to:
> Personnel Records Center
> Standard Oil Company (Indiana)
> Post Office Box 5738
> Chicago, Illinois 60680

In addition, on June 20, 1983, Amoco's Manager for Employee Relations sent a letter to all F & P employees stating: "Questions concerning your Amoco Oil benefits should be directed to Lucy Wilcox (312) 789-4934 or Sharon Zorn (312) 789-4966."

28. Plaintiff Rohlf's notes of a July 19, 1983, meeting with attorneys Decker and Lawyer (plaintiffs' counsel in this action) state, *inter alia:* "Write Amoco Oil a letter and demand severance."

29. During July 1983, attorneys Decker and Lawyer wrote letters to Amoco claiming severance on behalf of plaintiffs Gossard, Young, and Bokelman.

30. On November 9, 1983, attorney Rowley wrote letters to Amoco claiming severance, *inter alia*, on behalf of plaintiffs Godejahn, Moldestad, Pistulka, and Reinsma.

31. On March 30, 1984, attorney Nordholt wrote to Amoco claiming severance, *inter alia*, on behalf of plaintiff Rohlf.

32. The one plaintiff who did not file a claim for severance with Amoco (Broeker) has been a named plaintiff in this action since it was originally filed on October 11, 1983. At least since that time, he has been represented by attorneys Decker and Lawyer, the same attorneys who wrote claim letters to Amoco on behalf of plaintiffs Young, Gossard and Bokelman during July, 1983.

33. The list that Scoular provided to Amoco pursuant to the Sale Agreement had listed the Amoco F & P employees who would be offered jobs by Cropmate. Each of the plaintiffs was named on that list. After the sale of the F & P Division was consummated, Sharon Zorn of Amoco contacted Cropmate on September 8, 1983, to verify the employment of former Amoco F & P employees. She was told by Cropmate that several former Amoco employees, including plaintiff Moldestad, had been offered a job with Cropmate and had rejected the offer. She was further told by Cropmate, *inter alia*, that the other named plaintiffs had been employed by Cropmate.

34. On October 12, 1983, Amoco responded to the claim letters from counsel for plaintiffs Young, Gossard, and Bokelman. Amoco's letter denied the claims, explained why the claims were denied, enclosed a copy of the F & P Severance Policy, and explained that further information could be submitted by the claimants and how the denial could be appealed. No further information was submitted by these claimants and no administrative appeals were filed on their behalf.

35. On December 7, 1983, Amoco responded to the November 9, 1983, claim letters from counsel for plaintiffs Molestad, Pistulka, Godejahn, and Reinsma. Amoco's letter denied the claims, explained

why the claims were denied, enclosed a copy of the F & P Severance Policy, and explained that further information could be submitted by the claimants and how the denial could be appealed.

36. By letters dated January 12, 1984, counsel for plaintiffs Reinsma, Pistulka, Moldestad, and Godejahn appealed the decisions denying severance pay. No additional information was submitted by the claimants in these appeals. After receiving these appeals, Amoco wrote to Cropmate on February 29, 1984, to verify that Cropmate did, in fact, offer employment to these former Amoco employees. Cropmate responded by letter of March 6, 1984, reporting, *inter alia*, that:

Oliver E. Moldestad determined he did not want to be offered a job and left the company prior to the Cropmate takeover. The remaining names on the list were offered a job and are still on our payroll.

37. Thereafter, by letters dated March 20, 1984, R.K. Boknecht of Standard denied these plaintiffs' appeals. His letters stated:

Your letter of January 12, 1984, has been referred to me as fiduciary for review of denied claims under the Severance Allowance Policy—Fertilizer and Pesticides Division ("Policy"). The Policy, effective August 1, 1982, was adopted to apply to the sale or discontinuance of the Fertilizer and Pesticides Division of Amoco Oil Company.

Under the terms of the Policy, a copy of which was given to you with Mr. Mack's letter of December 7, 1983, no one is entitled to severance pay who is offered a job by the purchaser of his or her facility. Before the closing of the sale, the Cropmate Company advised Amoco Oil Company of those employees who would and would not be offered a job. [Godejahn-Moldestad-Pistulka-Reinsma were] among those to be offered a job, and [their] claim for severance was denied pursuant to Section B.1a and B.2a of the Policy.

When I received your letter of January 12, 1984, I asked Mr. Mack to verify with The Cropmate Company that it did offer [Godejahn-Moldestad-Pistulka-Reinsma] a job commencing September 1, 1983. On March 6, 1984, the Cropmate Company confirmed that [Godejahn-Moldestad-Pistulka-Reinsma were] offered a job. Therefore, [the] claim for severance pay is denied.

38. On April 18, 1984, Amoco responded to the March 30, 1984, claim letter from counsel for plaintiff Rohlf. Amoco's letter denied the claim, explained why the claim was denied, enclosed a copy of the F & P Severance Policy, and stated that further information could be submitted and how the denial could be appealed. No further information was submitted and the denial was not appealed.

Conclusions of Law

Based on the foregoing findings of fact, the Court now makes the following conclusions of law.

1. Severance benefits are employee benefits covered by the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1002(1), 1002(2)(B)(i); 29 C.F.R. §§ 2510.3–1(a)(3), 2510.3–2(b); *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1144–46 (4th Cir.1985), *aff'd,* —— U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); *Pinto v. Zenith Radio Corp.,* 480 F.Supp. 361 (N.D.Ill. 1979), *aff'd,* 618 F.2d 110 (7th Cir.1980).

2. ERISA provides a cause of action for a plan participant or beneficiary "to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This Court has jurisdiction of this action pursuant to 29 U.S.C. § 1132(e)(1).

3. Plaintiffs plead a number of state common law claims for severance benefits (breach of contract, unjust enrichment and negligence). With certain exceptions irrelevant here, however, ERISA preempts "all State laws insofar as they ... relate to any employee benefit plan," "directly or indirectly." 29 U.S.C. § 1144(a), (c); *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); *Shaw v. Delta Air*

*Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Plaintiffs' state law claims seeking to recover severance benefits are preempted by ERISA. *See, e.g., Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1146–48 (4th Cir.1985), *aff'd,* —— U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); *Jung v. FMC Corp.*, 755 F.2d 708, 714 (9th Cir.1985); *Pabst Brewing Co. v. Anger*, 610 F.Supp. 214, 216 (D.Minn. 1985), *aff'd,* 784 F.2d 338 (8th Cir.1986).

4. Plaintiffs' primary claims in this action are that defendants acted wrongfully in creating the F & P Severance Policy in place of the 1981 Severance Policy to govern the F & P Division divestiture. The F & P Severance Policy provides that severance would not be paid to any employee who was "offered a job by the new owner of the facility," whereas the 1981 Severance Policy provides that severance would not be paid "when the new owner offers ... *comparable* employment as determined by" Standard or its subsidiary (in this case, Amoco). At the same time, however, the F & P Severance Policy guaranteed severance to any F & P employee who was not offered a job by a purchaser, whereas severance under the 1981 Severance Policy is dependent upon (1) a management decision to implement severance in a particular employee-reduction situation, and (2) a management decision to include particular categories of employees in circumstances where the Policy was implemented. Nevertheless, plaintiffs allege that the decision to create the F & P Severance Policy constituted a breach of fiduciary duty under the 1981 Severance Policy and illegal discrimination under ERISA.

5. ERISA divides employee benefit plans into two categories: (1) retirement or pension plans; and (2) welfare benefit plans. Both the 1981 Severance Policy and the F & P Severance Policy are welfare benefit plans and not retirement plans under ERISA. 29 C.F.R. § 2510.3–2(a)–(b), promulgated pursuant to 29 U.S.C. § 1002(2)(B)(i). ERISA imposes requirements for the accrual, vesting and nonforfeitability of most benefits under retirement plans, as well as for the funding of such plans. 29 U.S.C. §§ 1051–61, 1081–86. However, these accrual, vesting, nonforfeitability and funding requirements are not applicable to welfare benefit plans. 29 U.S.C. §§ 1051, 1081(a)(1). Accordingly, an employee's inchoate "interest" in welfare benefits may be terminated if his employment is terminated or if the benefit plan is amended or abolished before he becomes eligible for benefits under the terms of the existing plan. *See Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406, 410 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

6. The uncontested facts show that plaintiffs were not entitled to payment of severance benefits under the 1981 Severance Policy at the time the F & P Severance Policy was created, in August 1982, and more than a year before their Amoco employment was terminated. Acceptance of plaintiffs' claims that defendants acted wrongfully in creating a new severance policy to govern the divestiture would mean that welfare benefit plans cannot be amended or abolished and, in effect, extend to welfare benefit plans the accrual, vesting and nonforfeitability requirements that Congress determined to establish only for retirement benefit plans.

7. It has been specifically held that an employer does not act in a fiduciary capacity or breach a fiduciary duty in amending a severance plan in a sale-of-business context to avoid payment of severance benefits to employees who continue to work for the purchaser. *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). That decision has been followed in other cases holding that an employer does not act in a fiduciary capacity in amending benefit plans with respect to nonaccrued and nonvested benefits. *See, e.g., Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986); *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1268–69 (7th Cir.1985); *United Independent Flight Officers, Inc. v. United Airlines, Inc.*, 756

F.2d 1274, 1280 (7th Cir.1985); *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund*, 763 F.2d 574, 577–78 (3d Cir.1985). Accordingly, plaintiffs' claims that defendants breached a fiduciary duty in creating the F & P Severance Policy to govern the divestiture fail as a matter of law.

■ 8. Plaintiffs allege that they have a contractual or equitable interest in severance benefits that is enforceable under federal common law. However, "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive." *Pilot Life Insurance Co. v. Dedeaux*, —— U.S. ——, ——, 107 S.Ct. 1549, 1556–1557, 95 L.Ed.2d 39 (1987). Moreover, the Seventh Circuit Court of Appeals has indicated that severance pay plans are not to be treated as contracts, but rather as employee welfare benefit plans under ERISA. *Sly v. P.R. Mallory & Co.*, 712 F.2d 1209, 1213 (7th Cir.1983). Additionally, even if the severance pay plans are treated as contracts, the 1981 Severance Policy states that "the company reserves the right to amend, modify, suspend or discontinue the Policy, and any such action shall apply to existing as well as future employees...." Thus the plaintiffs have no right to severance benefits under either equity or the law of contracts.

■ 9. Plaintiffs have no claim for "discrimination" under ERISA. The pertinent statutory section is an anti-retaliation provision—it makes it unlawful "to discharge, fine, suspend, expel, discipline, or discriminate against" an employee "for exercising any right to which he is entitled" under a benefit plan or "for the purpose of interferring with the attainment of any right to which [he] may become entitled" under a benefit plan. 29 U.S.C. § 1140. This section is modeled upon § 8(a)(3) of the National Labor Relations Act and "discrimina[tion]" thereunder means adverse treatment of an employee amounting to a "constructive discharge." *See, e.g., West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980);

*Goins v. Teamsters Local 639*, 598 F.Supp. 1151, 1154 (D.D.C.1984). Under the uncontested facts here, there was no "discrimination" against plaintiffs in the nature of a "constructive discharge."

■ 10. Plaintiffs further allege that the "job offer" condition for severance under the F & P Severance Policy is "arbitrary and capricious" because their jobs with Cropmate were or are insecure unless they agreed to purchase from and lease back to Cropmate the retail outlets where they were employed. However, it is settled law under ERISA that plaintiffs may not challenge the substantive terms of a benefit plan as "arbitrary and capricious," and that a court may not redraw a plan's eligibility criteria to provide benefits to employees based on claims that this would better accomplish the "purpose" of the benefit plan or avoid harshness caused by application of an eligibility rule to individual circumstances. *See Moore v. Reynolds Metals Co. Retirement Program*, 740 F.2d 454 (6th Cir.1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985). Thus, in another suit against Amoco seeking severance benefits under the same F & P Severance Policy, the court held that it could not award severance to employees who had been offered jobs with the purchaser, notwithstanding that one employee's job lasted only two weeks and another employee's job lasted only one week. *Wills v. Amoco Oil Co.*, CV 83–4222 and 84–4434 (S.D.Ill., Sept. 17, 1985)[Available on WESTLAW, DCT database].

■ 11. Plaintiffs further allege that defendants committed procedural violations of ERISA in not describing severance benefits in summary plan descriptions provided to them. However, the uncontested facts are that Amoco repeatedly disclosed to the plaintiffs the "job offer" limitation on eligibility for severance under the F & P Severance Policy promptly after the Policy was created and that plaintiffs were aware of it. It is also uncontested that Amoco disclosed the procedure for filing a claim for benefits. Accordingly, any procedural ERISA violations that occurred caused no prejudice or injury to plaintiffs' substantive

rights under the benefit plan. It has been held that procedural ERISA violations do not create an entitlement to severance benefits. *See, e.g., Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518, 1521–23 (11th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985); *Sly v. P.R. Mallory & Co.*, 712 F.2d 1209, 1211–13 (7th Cir. 1983). These cases held in the presence of procedural ERISA violations that the employers did not act "arbitrarily and capriciously" in interpreting severance plans to deny benefits to employees who went to work for the purchasers of facilities, notwithstanding that no such eligibility condition was stated in the plans themselves. By contrast, the "job offer" rule here is expressly stated in the F & P Policy. Thus, another court has held in another suit against Amoco arising out of the same F & P severance policy and substantially identical facts that the plaintiffs were not entitled to severance benefits contrary to the terms of the Policy on the basis of any procedural ERISA violations. *Hall v. Amoco Oil Co.*, CA No. 83–40–Amer (M.D. Ga., August 30, 1985).

12. Under ERISA's "arbitrary and capricious" standard for judicial review of denial of benefit claims, a court may consider whether the plan administrator's decision was supported by the terms of the plan. Nevertheless, the court is deferential to the administrator's interpretation of the plan, and will uphold it if it has a "rational basis" given the language of the plan. *See, e.g., Martinez v. Swift & Co.*, 656 F.2d 262, 263–64 (7th Cir.1981); *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 601 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983). However, no issue of plan "interpretation" is presented here; the F & P Severance Policy expressly provides that employees are not eligible for severance if they are "[o]ffered a job by the new owner of the facility."

13. Under ERISA's "arbitrary and capricious" standard, a reviewing court also considers whether there was "substantial evidence" to support the plan administrator's decision to deny the benefit claim.

However, the court considers only the evidence in the record before the plan administrator, and "is not to hold a *de novo* factual hearing on the question of the applicant's eligibility." *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820, 824 (7th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Where the evidence before the plan administrator was simply in conflict concerning the applicant's entitlement to benefits, the plan administrator's decision will not be overturned. *See, e.g., Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985); *Torrence v. Chicago Tribune Co.*, 535 F.Supp. 743, 746 (N.D. Ill.1981). The standard is whether a rational person could have decided the issue the way the plan administrator did, not whether the decision was one that the court would make as an original matter. *Pokratz*, 771 F.2d at 209.

14. As shown by the undisputed facts, all of the evidence before the plan administrator was that eight of the nine plaintiffs were offered jobs by Cropmate and were in fact employed by Cropmate after the sale. These facts are confirmed by the plaintiffs' deposition testimony in this case. Accordingly, the decisions denying them severance cannot be found to be "arbitrary and capricious" under the F & P Severance Policy, which provides that severance will not be paid to employees who are offered jobs by a purchaser of their facilities.

15. Of the nine plaintiffs, only plaintiff Moldestad was not employed by Cropmate after the sale. However, the information from Cropmate before the plan administrator was that he had been offered a job. When Moldestad appealed the denial of severance claiming he was not offered a job, Amoco again contacted Cropmate and was again told he had been offered a job. Accordingly, there was substantial evidence in the record before the plan administrator to support the denial of benefits under the F & P Severance Policy, which provides that an employee will not qualify for severance if he is offered a job by the purchaser of the facility. Under the "arbi-

trary and capricious" standard of review, "[i]t is not the proper function of the court to decide between two reasonable, but conflicting, interpretations of the facts presented." *Torrence v. Chicago Tribune Co.*, 535 F.Supp. 743, 746 (N.D.Ill.1981). *See also Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985). In another case involving the same F & P Severance Policy and substantially identical facts, the court held that the plan administrator's decision to deny severance was supported by substantial evidence and thus was not arbitrary or capricious. *Wills v. Amoco Oil Co.*, CV 83–4222 and 84–4434 (S.D.Ill. Sept. 17, 1985) [Available on WESTLAW, DCT database]. In this case as well, on the undisputed facts regarding the evidence before the plan administrator, the decision to deny plaintiff Moldestad severance benefits cannot be found to have been arbitrary or capricious.

16. At the request of defendants, the court may properly grant summary judgment for defendants without ruling on plaintiffs' motion to certify this action as a class action. *See, e.g., Wright v. Schock*, 742 F.2d 541 (9th Cir.1984); *Ahne v. Allis-Chalmers Corp.*, 102 F.R.D. 147 (E.D.Wis. 1984).

17. There is no genuine issue of material fact and defendants are entitled to summary judgment as a matter of law.