849 F.2d 1039
 57 USLW 2084, 3 Indiv.Empl.Rts.Cas. 1230,
9 Employee Benefits Ca 2544
 Philip A. YOUNG, Max Gossard, Robert L. Broeker, Mark
Bokelman, James Rohlf, Oliver E. Moldestad, Larry
Godejahn, Emery Pistulka, and Arthur
Reinsma, Plaintiffs-Appellants,
v.
STANDARD OIL (INDIANA) and Amoco Oil Company, Defendants-Appellees.
 No. 87-1866.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1987.
Decided June 23, 1988.
 
 Lynne H. Lawyer, Decker & Lawyer, Anderson, Ind., for plaintiffs-appellants.
 Stanley C. Fickle, Barnes & Thornburg, Indianapolis, Ind., for defendants-appellees.
 Before BAUER, Chief Judge, COFFEY, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 In this action, governed by the Employee Retirement Income Security Act (ERISA), the district court granted defendants' motion for summary judgment finding that there was no factual dispute that plaintiffs' severance benefits claims were properly denied, 660 F.Supp. 587 (1987). Plaintiffs challenged both the terms of the severance plan, which they contended was developed secretly, and the employer's decision to deny them benefits. Because we believe the record supports the district court's determination that there was no dispute about plaintiffs' eligibility for benefits and because we find the employer did not owe a fiduciary duty to the employees in developing the severance plan, we affirm.
 
 A.
 
 2
 Plaintiffs are former employees of defendant, Amoco Oil Company, a subsidiary of defendant, Standard Oil of Indiana, (collectively "Amoco"). Plaintiffs were employed in Amoco's Fertilizer and Pesticides Division ("F & P Division"), which manufactured and distributed agricultural fertilizers and crop protection materials. The division had 350 retail outlets, organized regionally into three divisions. Each retail outlet was managed by a crop guide manager and in some instances, by another employee called a "helper" or "secondman." Plaintiffs were all employed as crop guide managers with the exception of plaintiff Bokelman who was employed as a helper.
 
 
 3
 In late 1981, Amoco received a recommendation from its financial consultant to divest itself of the F & P Division. Amoco began searching for a buyer, but when no offers had been received by June, 1982, it was decided that the F & P division would be divested in any manner possible, including by sale of the division on a facility-by-facility basis or by cessation of operations.
 
 
 4
 At the time Amoco first considered divesting itself of the F & P Division, the 1981 Severance Allowance Policy of Standard Oil Company and Participating Companies (which included Amoco) was in effect. That policy provided that Amoco management could elect to "apply [the severance policy] to a particular employee-reduction situation." Management was free however, to exclude categories of employees from participation under the plan. In addition, the severance policy also contained an exclusion which read as follows:
 
 
 5
 3. Even though the Policy may be in effect for a particular employee reduction situation, an employee will not qualify for a severance allowance under the following circumstances:
 
 
 6
 g. Sale of facilities when the new owner offers to the employee comparable employment as determined by the Company.
 
 
 7
 In June, 1982, Amoco management sought permission to include all F & P Division employees under the terms of the 1981 Severance Policy in the event a sale of the F & P Division was consummated. Management approval for this request was granted on July 13, 1982. Thus, under the terms of the 1981 policy, all employees of the F & P Division, who were offered a comparable position by the Division's buyer, were not entitled to severance benefits.
 
 
 8
 Shortly thereafter, it became evident that a sale of the F & P Division in its entirety was not possible and a suggestion was made to sell the division piecemeal. At the same time, in light of the high costs associated with applying the 1981 severance policy to the sale of the F & P division,[1] Amoco management suggested that a different severance policy be created for the F & P Division. In a memorandum to Standard, Amoco's president wrote:
 
 
 9
 [I]t is unlikely that potential buyers would provide wages or the level of benefits comparable to those presently offered by Amoco Oil. Under these conditions, all present [F & P] employees would probably qualify for severance benefits, regardless of employment opportunities with the new owners. Such payments would amount to approximately $6,200,000.
 
 
 10
 * * *
 
 
 11
 Amoco recommends that a special severance ... policy be adopted for the [F & P] divestiture....
 
 
 12
 1. Any ... Amoco employee who is offered a position with a new owner will forfeit severance consideration, regardless of salary, benefits or position.
 
 
 13
 2. Severance payments will be given to current employees who are not offered employment with the new owner, and to employees when facilities are not sold and operations are discontinued.
 
 
 14
 The amended severance policy, as outlined in the president's memorandum, was approved on August 6, 1982, but was effective as of August 1, 1982.
 
 
 15
 On August 3, 1982, Amoco sent a letter to the F & P employees announcing its plans to sell the division. The letter made a perfunctory reference to the employees' severance benefits rights,[2] but did not mention that those rights had been made a part of a new policy. Thus, the employees were not made aware that they were now ineligible for benefits if they received any offer of employment from a potential purchaser rather than an offer of comparable employment, as previously set forth in the 1981 severance policy. Nor did a later press release or a "Question & Answer" brochure make this change clear.
 
 
 16
 Amoco began selling segments of the F & P Division to various buyers. On April 29, 1983, the Scoular Company offered to purchase the remaining segments. In its offer, Scoular stated:
 
 
 17
 Most of the retail outlets will be offered for sale to the present Amoco plant managers [crop guide managers] at 82.5% of net book value. The retail outlets will be leased back under long term agreements.[3] 3] Most of Amoco's employees, including the owner-manager [sic] of the leased retail outlets, will be offered comparable jobs.
 
 
 18
 On June 20, 1983, Standard prepared a letter announcing F & P's sale to Scoular and the effective date of the sale. According to the letter, the closing date of the sale was August 31, 1983. Thus, on September 1, 1983, F & P employees could consider themselves terminated by Amoco and employed by Scoular. The letter stated "the termination date will be used as the effective date of employment for those employees who are offered and subsequently accept employment with the Scoular company."
 
 
 19
 As part of the agreement between Amoco and Scoular for the sale and purchase of F & P's assets, Scoular agreed to make offers of employment to those F & P employees listed on an attachment to the purchase agreement. Cropmate, the division created by Scoular to replace F & P, began reviewing crop guide managers and secondmen, presumably to compile the list of the employees it intended to retain. It was agreed that the list would be compiled by July 20, 1983.
 
 
 20
 In July, 1983, plaintiffs were invited to meet with Cropmate to discuss their employment. According to plaintiffs' version of the events, no offers of employment were made at the July meeting. Cropmate's formal presentation centered solely on the leaseback arrangement discussed in Scoular's April 29, 1983 letter. Plaintiffs allege that they were told if they did not enter into a leaseback arrangement with Cropmate, their jobs could not be guaranteed. At the conclusion of the meeting, virtually all the crop guide managers refused to sign a leaseback arrangement. When plaintiffs asked questions about severance, they allege they were simply told they did not qualify.
 
 
 21
 Defendants admit that "there are disputed factual issues regarding what was said at [that] meeting about employment with Cropmate and Cropmate's proposal that crop guide managers purchase from and lease back to Cropmate their retail outlets...." Nevertheless, defendants maintain plaintiffs were offered employment and were told that if they accepted employment with Cropmate, they would no longer be eligible for Amoco severance benefits. Defendants admit they did not provide copies of the new severance policy or explain severance benefit claim procedures to plaintiffs. They claim however, that all employees were informed where to write or call for information. Amoco points out that all nine plaintiffs were placed on Cropmate's July employment list.
 
 
 22
 Shortly before August 31, 1983, the closing date of the sale, plaintiffs contend they were told to continue operating their facilities (apparently regardless of whether they entered into a leaseback arrangement). On September 1, 1983, eight of the nine plaintiffs began working for Cropmate. Only plaintiff Moldestad refused to work for Cropmate.
 
 
 23
 As of 1984, six of the nine plaintiffs remained in Cropmate's employ. Of those six, three purchased their retail outlets and leased them back to Cropmate. Plaintiff Young continued to work for Cropmate only until September 16, 1983. Plaintiff Broeker quit Cropmate in January, 1984, when Cropmate allegedly found a crop guide manager willing to buy his facility.
 
 
 24
 Plaintiffs Gossard, Young, and Bokelman sought severance benefits under the F & P plan in late August, 1983. At that time, Amoco called Cropmate and verified that those plaintiffs as well as the other six were employed by Cropmate.[4] Assured by Cropmate that all but plaintiff Moldestad were working for Cropmate, the administrator of Amoco's severance plan denied Gossard's, Young's and Bokelman's claims for benefits. Plaintiffs Godejahn, Moldestad, Pistulka, and Reinsma later sought benefits in November, 1983. Again, their claims were denied on the basis that they had received an offer of employment from Cropmate. Plaintiff Rohlf too claimed benefits, but not until March 30, 1984. That claim was also denied. Plaintiff Broeker did not claim benefits but was represented by attorneys for all the other plaintiffs who did.
 
 B.
 
 25
 On November 27, 1985, plaintiffs filed a second amended complaint under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1001 et seq. (1974), (ERISA), consolidating three class actions originally filed on behalf of themselves and approximately 160 other crop guide managers in Indiana, Minnesota, and Ohio. In their suit, plaintiffs alleged that Standard and Amoco's failure, both individually and as co-administrators of the severance plan, to pay the plaintiffs severance benefits constituted: (1) a wanton and willful breach of plaintiffs' employment contract; (2) unjust enrichment to defendants; and (3) a wrongful, arbitrary, and capricious denial of benefits based on an unilateral modification of the severance plan. Plaintiffs further alleged that Standard and Amoco negligently administered the severance policy, breached their fiduciary duty, and failed to provide information with regard to the unilateral creation of the special F & P severance policy.
 
 
 26
 Plaintiffs sought compensatory damages equal to their severance payments, punitive damages, statutory penalties under ERISA, and attorney's fees.
 
 
 27
 Defendants filed a motion for summary judgment on all claims and urged the district court to delay ruling on the class certification issue until it had ruled on the motion for summary judgment, which defendants believed would resolve the case. The court agreed to do so. Both sides then provided the court with extensive briefs and reams of documentation.
 
 
 28
 After a hearing on the matter, the court issued an order on April 27, 1987, granting defendants' motion for summary judgment. Finding that ERISA preempts all state law claims for severance benefits, the court granted judgment to defendants on plaintiffs' breach of contract, unjust enrichment, and negligence claims. The district court ruled that plaintiffs' primary remaining claim was that defendants "acted wrongfully in creating the F & P Severance Policy in place of the 1981 Severance Policy to govern the F & P Division divestiture."
 
 
 29
 The district court then determined that severance benefits are "welfare benefits" and not retirement benefits under ERISA and that severance benefits are not subject to the stringent ERISA requirements governing retirement benefits. As a corollary, the court ruled an employee's interest in severance benefits does not vest like retirement benefits and may be unilaterally abolished by the employer. The district court then determined that an employer does not breach a fiduciary duty when it unilaterally amends a severance benefit plan in a sale-of-business context to avoid coverage to employees who continue to work for the purchaser. Thus, the claim that defendants' breached their fiduciary duty when they created the F & P policy, failed as a matter of law.
 
 
 30
 The court also granted defendants' judgment on plaintiffs' federal breach of contract claim indicating that ERISA does not contemplate that severance plans be treated as contracts. Finally, the court granted judgment on the ERISA discrimination claim, finding absolutely no facts to support such a claim.
 
 
 31
 The court then turned to the issue of whether the denial of plaintiffs' severance benefit claims was "arbitrary and capricious." The district court said:
 
 
 32
 Plaintiffs further allege that the 'job offer' condition for severance under the F & P severance policy is 'arbitrary and capricious' because their jobs with Cropmate were or are unsecure unless they agreed to purchase from and lease back to Cropmate the retail outlets where they were employed. However, it is settled law under ERISA that plaintiffs may not challenge the substantive terms of a benefit plan as 'arbitrary and capricious,' and that a court may not redraw a plan's eligibility criteria to provide benefits to employees....
 
 
 33
 The court also held that the plaintiffs had been informed of the requirements for obtaining benefits under the F & P severance plan. Thus, plaintiffs were not prejudiced by any alleged procedural violations. Moreover, procedural violations could not give rise to a claim for benefits. As a final matter the court determined that the defendants' decision to deny benefits was based on substantial evidence. Constrained to uphold the plan administrator's decision, if rational, the court found the denial of benefits appropriate given that all nine plaintiffs had been offered employment with Cropmate. This appeal followed.
 
 C.
 
 34
 On appeal, plaintiffs contend summary judgment was inappropriate for two reasons. First, plaintiffs assert the district court resolved material issues of fact in the defendants' favor. Plaintiffs contend that they qualified for benefits under the F & P severance plan because they were never offered employment with Cropmate prior to their termination from Amoco. The fact that they automatically began working for Cropmate the day after their positions with Amoco were terminated was not, they insist, proof that they were offered employment. In fact, plaintiffs assert employment with Cropmate was conditioned on participation in the leaseback arrangement, a fact of which defendants were aware when plaintiffs were terminated.
 
 
 35
 Defendants argue there is no question that all plaintiffs either worked for or were offered a position with Cropmate the day after their jobs with Amoco ended. Defendants assert that it was undisputed that none of the plaintiffs were required to purchase their retail outlets to become employed by Cropmate. The fact that Cropmate was looking for owner/managers for the retail facilities and therefore could not assure plaintiffs continued employment in the event the individual outlets were resold, was not relevant to the fact that plaintiffs were offered employment. The F & P division's special severance policy stated that if plaintiffs received a job offer from Cropmate, plaintiffs would no longer be eligible for benefits. The severance policy did not specify that the employment offer had to be for permanent or comparable employment. Thus, by raising issues relating to the leaseback arrangement and the unsecured nature of their employment, plaintiffs are impermissibly attacking the substantive protections afforded by the F & P severance plan.
 
 
 36
 Plaintiffs also contend summary judgment was inappropriate on their breach of fiduciary duty claim, arguing Amoco breached its duty when it unilaterally amended the 1981 severance plan without providing any notice of the change to them. Defendants' repeated failure to provide information regarding the consequences of those changes also contributed to this breach of duty.
 
 
 37
 Defendants point out that with respect to severance benefit plans, ERISA does not impose a fiduciary duty on the employer to act exclusively in the interest of the employees. Although the employer may be required to act in a fiduciary capacity in administering a benefit plan, there is no fiduciary duty in implementing, altering or abolishing a benefit plan involving non-vested interests. Thus, defendants were free to create the special F & P severance plan without notice to plaintiffs. Conceding that some notice of the terms of the plan might have been required after "the new plan [was] implemented," defendants argue that procedural violations arising from their failure to provide such notice does not amount to a violation of ERISA.
 
 
 38
 Finally, plaintiffs insist the district court applied the wrong standard for reviewing the benefit plan administrator's decision to deny benefits. According to plaintiffs, the district court failed to examine whether defendants acted in good faith. Defendants counter by pointing out that good faith has never been the standard for reviewing a decision to deny severance benefits. Thus, they argue that the district court did not err.D.
 
 
 39
 Our review of the record, leads us to conclude that the district court's decision to grant defendants' motion for summary judgment was correct.
 
 
 40
 Under ERISA, employee benefits are divided into two categories--"welfare" benefits and "retirement or pension" benefits. 29 U.S.C. Sec. 1002(1)-(2). Although ERISA imposes stringent accrual, vesting, and funding requirements on retirement benefit plans, such requirements are not imposed on welfare benefit plans. 29 U.S.C. Secs. 1051, 1081. Severance benefit plans are welfare benefit plans. Holland v. Burlington Industries, Inc., 772 F.2d 1140, 1145 (4th Cir.1985) aff'd, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559, cert. denied, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). Gilbert v. Burlington Industries, Inc., 765 F.2d 320 (2d Cir.1985), aff'd, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986). As such, severance benefits are unaccrued, unvested benefits. Moreover, severance benefit plans, though subject to certain disclosure (29 U.S.C. Secs. 1021-1031) and fiduciary (29 U.S.C. Secs. 1101-1114) requirements, are exempt from the more stringent ERISA requirements. 29 U.S.C. Secs. 1051, 1081. An employer may therefore, unilaterally amend or eliminate a severance plan without violating ERISA. Sutton v. Weirton Steel Div. of Nat. Steel Corp., 724 F.2d 406, 410 (4th Cir.1983), cert. denied, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). This is so because an employer is permitted to act in a dual capacity as both the manager of its business and a fiduciary with respect to unaccrued benefits. An employer is therefore, free to alter or eliminate severance benefits (which are usually solely funded by the employer) without consideration of the employees' interests. Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). In short, an employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan.
 
 
 41
 ... ERISA does not impress a trust upon [an employer's] corporate treasury for the payment of the contingent benefits.... It is the unfunded nature of the ... contingent liability that distinguished [these benefits from vested benefits under ERISA].
 
 
 42
 Sutton, 724 F.2d at 412.
 
 
 43
 [T]he mere fact that a company has named itself as a pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior in negotiations concerning pension benefits not otherwise affected by the requirements of ERISA.
 
 
 44
 United Ind. Flight Officers v. United Airlines, 756 F.2d 1262, 1268 (7th Cir.1985), quoting Sutton v. Weirton Steel Div. of Nat. Steel Corp., 567 F.Supp. 1184, 1201. Thus, just because Amoco administered its employees' severance plan, does not mean Amoco owed a fiduciary duty of care to its employees with respect to the amendment or abolishment of that plan. Though perhaps desirable in normal business conduct, Amoco owed no legal duty to reveal that it intended to create a special severance plan for the divestiture of the F & P division. We conclude the district court properly granted summary judgment on plaintiffs' breach of fiduciary claim.
 
 
 45
 We must next determine whether summary judgment was appropriate as to plaintiffs' claims that Amoco's denial of their severance benefit claims violated ERISA.
 
 
 46
 A court will reverse a benefit determination only if it was arbitrary and capricious. 29 U.S.C. Sec. 1001 et seq.; Adcock v. Firestone Tire & Rubber Co., 822 F.2d 623 (6th Cir.1987); Anderson v. CIBA-Geigy Corp., 759 F.2d 1518 (11th Cir.), cert. denied, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985); Sly v. P.R. Mallory & Co., Inc., 712 F.2d 1209 (7th Cir.1983). Plaintiffs contend the defendants' decision to deny benefits should be subject to a more stringent "good faith" standard of review whereby Amoco's motives for implementing the new F & P severance plan are subject to examination. Plaintiffs claim this standard should be applied because the F & P severance plan was the product of bad faith. That is, given the number of procedural violations committed by Amoco when it implemented the new plan, plaintiffs argue the plan was adopted in bad faith.[5] Amoco's denial of their benefits, based on this plan, was therefore also in bad faith.
 
 
 47
 An argument similar to that made by plaintiffs in this case was made by plaintiffs in Anderson v. CIBA-Geigy Corp., 759 F.2d 1518 (11th Cir.1985). There, plaintiffs claimed their employer's failure to designate a plan administrator and to notify the employees of eligibility requirements mandated a different standard for reviewing the denial of their benefit claims. The Eleventh Circuit Court of Appeals rejected this argument, stating:
 
 
 48
 Whatever the merits of plaintiffs' argument, there is simply no authority for the proposition that procedural errors in an ERISA plan's management requires something other than the arbitrary and capricious standard of review. On the contrary, in a case where ERISA's provisions were 'flouted' in a 'wholesale and flagrant manner,' the arbitrary and capricious standard was still applied ... Blau v. Del Monte Corp., 748 F.2d 1348, 1352-53 (9th Cir.1984)
 
 
 49
 ....
 
 
 50
 759 F.2d at 1521.
 
 
 51
 In Holland v. Burlington Industries, Inc., the Fourth Circuit Court of Appeals, also taking note of the Blau decision, rejected the argument that a different standard of review should be applied based on numerous procedural violations. "We see no reason to vary the standard based on procedural violations indicating bad faith, for such situations can be adequately resolved under the traditional standard." 772 F.2d at 1149.
 
 
 52
 We join the Anderson and Holland courts and reject plaintiffs' contention that something other than the arbitrary and capricious standard should be applied in reviewing Amoco's decision to deny plaintiffs' severance benefit claims. Although Amoco certainly could have provided plaintiffs more information regarding the effects of the new F & P severance plan, Amoco's failure to do so does not give rise to a different standard of review. Moreover, we do not consider the defendants' behavior to be as flagrant as that described in Blau. Amoco made general statements about severance eligibility requirements to its employees. The employees were also told where to obtain additional information. The severance plan was not actively concealed from them and they were notified when their benefit claims were denied.
 
 
 53
 The district court properly evaluated Amoco's decision to deny plaintiffs' benefit claims by applying the arbitrary and capricious standard of review. We must now determine whether the court's decision granting summary judgment was correct.
 
 
 54
 Plaintiffs contend that there was a factual dispute about whether they were actually offered employment by Cropmate. Thus, Amoco's decision to deny benefits was arbitrary and capricious and summary judgment on that issue was inappropriate. At the district court, plaintiffs contended their continued employment with Cropmate was contingent on their acceptance of a leaseback arrangement with Cropmate. They assert the fact that they were still employed on the date the transfer of assets from Amoco to Cropmate was completed was, therefore, irrelevant in determining whether they had become employed by Cropmate. Plaintiffs argued they were never officially asked to stay on with Cropmate and should therefore have received severance benefits under the F & P plan.
 
 
 55
 Defendants maintained that all plaintiffs were employed by Cropmate on the day the transfer of assets was finalized, whether or not they had entered into a leaseback arrangement with Cropmate. In fact, six of the nine plaintiffs were still employed by Cropmate in 1984 and 1985. The defendants claimed that plaintiffs' assertions that their continued employment with Cropmate could not be assured, absent an agreement to enter into a leaseback arrangement, is not relevant to the issue of whether plaintiffs were offered employment.
 
 
 56
 The district court agreed with defendants, finding that there was sufficient evidence before the plan administrator to support his conclusion that plaintiffs had all been offered employment with Cropmate. Therefore, plaintiffs were ineligible for benefits under the F & P severance plan. Given that the administrator's decision was rational, the district court granted defendants' motion for summary judgment.
 
 
 57
 We agree with the district court. The evidence before the plan administrator was that all plaintiffs were terminated by Amoco on August 31, 1983, and became employees of Cropmate on September 1, 1983. Plaintiffs became employees of Cropmate whether they entered into a leaseback agreement or not. It is certainly true that plaintiffs may have thought they were required to enter into a leaseback arrangement, but on September 1, 1983, this notion was dispelled when plaintiffs became employed by Cropmate.
 
 
 58
 It is also true that plaintiffs' employment with Cropmate may have been less than secure and that they could have been terminated had Cropmate found someone willing to enter into a leaseback arrangement. However, the F & P severance plan did not make eligibility for benefits contingent on an offer of comparable or permanent employment, just employment.
 
 
 59
 Under the terms of the F & P severance policy, plaintiffs were ineligible for benefits once they were offered employment--whether permanent or not--with Cropmate. An express offer of employment may or may not have been made to plaintiffs at the July, 1983, meeting between plaintiffs and Cropmate.[6] We cannot be sure because there are disputes about what occurred at that meeting. Nonetheless, an implicit offer of employment was made on September 1, 1983, when eight of the nine plaintiffs automatically became Cropmate employees. Only plaintiff Moldestad refused employment with Cropmate. Nevertheless, the evidence before the plan administrator was that Moldestad was on the list of Amoco employees to whom Cropmate made offers and hired. In addition Cropmate verified that it had offered employment to Moldestad but that he refused it.
 
 
 60
 All but plaintiff Moldestad accepted Cropmate's offer by staying with the company. At least six plaintiffs remained in Cropmate's employ as of 1984 and 1985 when their depositions were taken. Yet, only three of these six actually purchased their retail outlet and entered into a leaseback arrangement with Cropmate. Surely then, plaintiffs' employment with Cropmate was more secure than it might have seemed at first.
 
 
 61
 Plaintiffs' complaint that their continued employment with Cropmate was insecure is really a complaint that the F & P severance policy did not provide sufficient protection in the event that they were hired by the new owner of the F & P division but then released. This, as defendants point out, is an impermissible attack on the substantive merits of the severance plan. See Moore v. Reynolds Metals Co. Retirement Program, 740 F.2d 454, 456 n. 4 (6th Cir.1984), cert. denied, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985) (courts are not permitted to modify language of a benefit plan).
 
 
 62
 We conclude, based on the evidence presented to the Amoco plan administrator, there was no issue of fact whether plaintiffs were offered employment with Cropmate. Thus, we find that the administrator's decision to deny plaintiffs' claims was rational and the district court's resulting decision to grant summary judgment was appropriate.
 
 
 63
 The district court's order granting defendants' motion for summary judgment is AFFIRMED.
 
 
 
 [1]
 Amoco determined that if the F & P Division were sold in its entirety, severance benefit payments could equal as much as $6.2 million
 
 
 [2]
 The letter said:
 If the system is sold as a whole or in regional segments, current employees may be offered employment by the purchaser. Should such sales not occur or employees are not offered employment by the new owners, Amoco will provide severance ... benefits. (emphasis added).
 
 
 [3]
 This arrangement was apparently proposed to allow Scoular to finance its acquisition of the F & P Division facilities
 
 
 [4]
 Amoco contacted Cropmate on September 8, 1983, to verify the names on the July employment list and that all nine plaintiffs had been offered employment
 
 
 [5]
 These alleged violations included Amoco's failure to notify plaintiffs of the actual effects of the changes in the severance plan; Amoco's failure to make claim procedures known to plaintiffs; Amoco's unwillingness to discuss severance benefits; and Amoco's failure to make available more information about the plan
 
 
 [6]
 From testimony of at least one plaintiff, all plaintiffs were offered employment by Cropmate in July, 1983
 [Deposition of Plaintiff Broeker, n. 45, Plaintiffs' Response to Defendant's Motion for Summary Judgment, pp. A2117 through A2119]
 Q: Was there anything said at that [July 11, 1983] meeting about employment?
 A: I think that what they told us was that we would be hired by Cropmate as employees. The plan was, we buy the plants, they would pay us this 13 and 1/2 percent, and if we go down to the bank and borrow the money at the prevailing rate, which was 13 and 1/2 percent, that 13 and 1/2 percent leaseback that they paid us would pay the principal payment as well as the interest payment and that we would become employees of Cropmate.
 Q: Was anything said about having to purchase the plant in order to become employed?
 A: The conversation that ensued, basically we were told that the plan was to sell the plant. That was what the Cropmate Company wanted, was for us to purchase the plant. If we did not purchase the plant, that did not necessarily mean that we would not become employed.
 However, it also meant that there was no guarantee as to how long we would be employed, because their plan was to sell each and every plant and find a buyer and that the primary objective here was to make the buyer the manager, although in some cases that may not necessarily be the case.
 If somebody bought the plant and did not want to run it, just wanted it for investment, then maybe the manager would get to run that plant.
 By the same token, they said if the manager bought the plant, he wasn't necessarily guaranteed of being the manager but just the owner. It may be a situation where the company might want somebody else to run it.
 Q: So did you understnad [sic] then, even if you didn't buy the plant, there was a possibility of continued employment by Cropmate?
 A: My understanding was that if I didn't buy the plant, I would probably have a job but it was questionable as to, especially in my position, I was kind of on the bubble so to speak because I had--It at the time was considered a pretty good plant and I knew there was a lot of people looking at it and the competition was just kind of standing around waiting for that plant to sell, and I knew that if--I felt that if I didn't buy it, my position was pretty shaky.