William F. GRUN, Plaintiff,

v.

PNEUMO ABEX CORPORATION, PA Holdings Corporation and the Henley Group, Inc., Defendants.

No. 90 C 5273.

United States District Court, N.D. Illinois, E.D.

Nov. 18, 1992.

Brian D. Gregory, Donovan, Leisure, Newton & Irvine, Los Angeles, CA, for plaintiff.

Gary S. Kaplan, William Robert Sullivan, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Hope A. Jacobson, Los Angeles, CA, for defendants.

## ORDER

NORGLE, District Judge.

Before the court are plaintiff William F. Grun's ("Grun") motion for summary judgment with respect to Count I of his complaint and defendants' motion for summary judgment with respect to Counts I, II, and III of the complaint. Pursuant to 28 U.S.C. § 636(b)(1), the court referred the motions for summary judgment to Magistrate Judge Joan H. Lefkow. The Magistrate Judge, after review of the record, issued on

October 1, 1992 a 19–page Report and Recommendation (the "Report," attached as Exhibit A). For the following reasons, the Report is adopted in part.

## FACTS

In January, 1986, Grun became president and general manager of NWL Control Systems ("NWL"), a division of defendant Pneumo Abex Corporation ("Pneumo Abex") headquartered in Kalamazoo, Michigan. In 1987, Grun entered into a severance compensation agreement (the "SCA") with Pneumo Abex. The SCA provided that Grun would be entitled to severance compensation, calculated in accordance with the terms therein, if he terminated his employment for any one of several "good reasons" set forth in the SCA within two years after a change in control of Pneumo Abex. In April, 1988, Pneumo Abex was purchased by PA Holdings Corporation, which constituted a change in control under the SCA. In 1989, Grun resigned from NWL and requested that he be paid in accordance with the terms of the SCA; Grun supported his entitlement to the severance compensation by identifying five "good reasons" under the SCA for his resignation. After reviewing the "good reasons" submitted by Grun, Pneumo Abex determined that Grun did not have reason to terminate his employment and, accordingly, denied compensation under the SCA. Subsequently, Grun initiated the instant suit, seeking to recover benefits from Pneumo Abex, under the SCA and under an executive bonus plan, and punitive damages from PA Holdings Corporation (PA Holdings) and The Henley Group, Inc. (Henley) for contractual interference.

In support of his motion for summary judgment, Grun asserts that the events necessary to trigger his right to receive severance compensation under the SCA have occurred. Pneumo Abex responds that Grun has interpreted the SCA incorrectly and that none of the preconditions set forth in the SCA have been satisfied. The defendants further argue that Count II of Grun's complaint is preempted by the Employment Retirement Income Security Act of 1974 ("ERISA"), and furthermore, that the undisputed facts establish that Grun cannot prevail on the merits of either Count II or III.

Magistrate Judge Lefkow recommended that this court grant Grun's motion for summary judgment with respect to Count I, grant defendants' motion for summary judgment with respect to Count II, and deny defendants' motion with respect to Counts I and III. Both Grun and the defendants have filed objections to the Report, each objecting to the recommended finding of summary judgment against them. The court has completely reviewed the Report and the arguments of counsel on a *de novo* standard. 28 U.S.C. § 636(b)(1).

## DISCUSSION

With respect to Count I, the Magistrate Judge concluded that Grun was entitled to recover severance compensation under ¶ 3(e)(vi) of the SCA. Paragraph 3(e)(vi) provided that Grun would be entitled to severance compensation if, following a change in control of Pneumo Abex, the following occurred: "a relocation of [Pneumo Abex's] principal executive offices *or* [Grun's] relocation to any place other than the location at which [Grun] performed [his] duties prior to a Change in Control of [Pneumo Abex]." (emphasis added). As the Magistrate Judge found, there is no dispute that Pneumo Abex's executive offices in Boston, Massachusetts were closed in the fall of 1989. Magistrate Judge Lefkow thus concluded that all events necessary to establish Grun's rights under the SCA had occurred and recommended that Grun's motion for summary judgment on Count I of the complaint be granted. The court, however, disagrees with the Magistrate Judge's analysis and, accordingly, denies all parties' summary judgment motions with respect to Count I.

Despite Pneumo Abex's concession that ¶ 3(e)(vi) "is awkwardly drafted and seems to make little sense," the terms and meaning of that paragraph are actually straightforward and unequivocal. The plain meaning of this provision is that Grun would be

entitled to the SCA benefits if Pneumo Abex's principal executive offices in Boston were relocated; the fact that Grun, who worked in Kalamazoo, Michigan, and lived in Portage, Michigan, would be entitled to a substantial severance benefit because of such a relocation is not contradicted by the terms. Evidently aware of the plain meaning of ¶ 3(e)(vi), Pneumo Abex advised Grun on March 25, 1988, that it "did not intend for [Grun] to become entitled to termination compensation under Section 3(e)(vi) ... by virtue of the relocation of the Company's principal executive offices *unless* there is also a relocation of *your present* office." Thus, whether Grun is entitled to SCA benefits solely because of Pneumo Abex's move from Boston depends on what, if any, effect the March 25, 1988 letter had on the terms of ¶ 3(e)vi).

■ As the Magistrate Judge concluded, the SCA is an employee benefit plan, the application and interpretation of which is governed by ERISA. Under ERISA, employee benefits are either "welfare" benefits or "retirement or pension" benefits. 29 U.S.C. § 1002(1), (2). Under ERISA, retirement benefit plans are subjected to stringent accrual, vesting, and funding requirements; such requirements, however, are not imposed on welfare benefit plans. 29 U.S.C. §§ 1051, 1081. Severance benefit plans, such as the SCA, are welfare benefit plans. *Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1045 (7th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988); *Holland v. Burlington Indus., Inc.*, 772 F.2d 1140 (4th Cir.1985) *aff'd*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559, *cert. denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). Consequently, severance benefits are unaccrued, unvested benefits, and even though subject to certain disclosure (29 U.S.C. §§ 1021–1031) and fiduciary (29 U.S.C. §§ 1101–1114) requirements, are exempt from the more stringent ERISA requirements. *Young*, 849 F.2d at 1045. Because an employer is permitted to act as both the manager of its business and a fiduciary with respect to unaccrued benefits, an employer is therefore free to alter or eliminate severance benefits without consideration of the employees' interests. *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied*, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). Accordingly, an employer may unilaterally amend or eliminate a severance plan without violating ERISA. *Id.; see also Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739, 743 (7th Cir.1991) (an employer may change or abolish welfare benefits without violating ERISA); *Sejman v. Warner–Lambert Co.*, 889 F.2d 1346, 1438 (4th Cir.1989) (because severance benefits are contingent and unaccrued, an employer may unilaterally amend or eliminate the provisions of a severance plan).

■ Although the terms of ERISA would permit Pneumo Abex to unilaterally modify the SCA, Pneumo Abex agreed to forego that right. ERISA requires every employee benefit plan to be created by and maintained pursuant to a written instrument. 29 U.S.C. § 1102(a)(1). Through these instruments, parties are free to subject such benefits to requirements that are not mandated by ERISA, or they may reserve the power to terminate or modify such plans. *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 603 (7th Cir.1989). The employee benefits which Grun seeks to recover were created and governed by the SCA, with the following provision: *"Miscellaneous.* No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by [Grun] and [Pneumo Abex]." The March 25, 1988 letter of Pneumo Abex was not signed or agreed to by Grun; therefore, by the terms of the SCA Pneumo Abex's epistolary clarification was not sufficient to modify the express terms of the SCA.

■ The plain language of ¶ 3(e)(vi) is clear and unambiguous, and as such, the interpretation of this paragraph is a matter of law. The overriding goal of contract interpretation is to give effect to the mutual intent of the parties at the time the contract was made. *Lowrance v. Hacker*, 888 F.2d 49, 51 (7th Cir.1989). Thus, even though the literal meaning expressed by

the language of a contract is usually the best evidence of that intent, even unambiguous language can be disregarded when the parties meant something other than that which was committed to paper. *White v. Roughton*, 689 F.2d 118, 120 (7th Cir. 1982). The record before the court does not provide an explanation as to why Peumo Abex would agree to compensate Grun with over $800,000 in severance benefits for an office relocation which had minimal, if any, affect on Grun's work-related activities. That Grun is entitled to SCA benefits because of Pneumo Abex's relocation from Boston is a nonsequitur, indicative of a mutual mistake in the contract terms, which raises material issues of genuine facts concerning the SCA's execution.

▇▇▇▇ The intended purpose of the SCA was to induce Grun to remain employed by Pneumo Abex, in the event of a change in control, by providing Grun with certain job assurances. That Grun, a Michigan resident, receive the SCA benefits upon relocation of Pneumo Abex's Boston office is not a logical job assurance which would effectuate the purpose of the SCA. In general, parties' intentions are to be measured by their outward manifestations, as opposed to some secret, cryptic, or turbid expression of intent. The court, however, when necessary to carry into effect the intention of the parties, must also consider the relevant circumstances surrounding the negotiation and execution of the document. *Connecticut Gen. Life Ins. Co. v. Chicago Title and Trust Co.*, 714 F.2d 48 (7th Cir. 1983). Whether Pneumo Abex and Grun intended to enter into an agreement whereby Grun would receive a substantial monetary benefit upon the occurrence of an event which would have no bearing on the job performed by Grun raises genuine issues of material fact. To decipher the actual expectations of the parties, the court must look to the negotiation, bargaining, and past conduct of the parties, and to the context in which the SCA was drafted. Thus, material issues of fact, which preclude summary judgment, exist as to Count I of Grun's complaint, and the Magistrate Judge's recommendation that summary judgment be granted in Grun's favor is rejected.

The second cause of action presented in Grun's complaint is entitled "Intentional Interference With Contractual Relations Against PA Holdings and Henley." Because the SCA constitutes an employee benefit plan within the meaning of ERISA, the Magistrate Judge concluded that this cause of action was preempted by ERISA and recommended granting summary judgment in favor of the defendants. The Court adopts the Magistrate Judge's recommendation, but modifies the reasoning as follows.

▇▇▇▇ The preemptive provision of ERISA is to be broadly construed and extends to common law tort and contract actions. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Even claims based on state-law doctrines that are not specifically designed to affect benefit plans, but that include such plans within their sweep, are preempted when the claims relate to the administration of a benefit plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Grun's claims arise from his efforts to attain benefits under the SCA. His complaint alleges that PA Holdings and Henley designed and schemed to deprive him of the benefits of the SCA. This allegation amounts to interference with the administrative duties created by the SCA and is thus an activity regulated by ERISA.

▇▇▇▇ Although any state-law claims Grun may have against PA Holdings or Henley for interference with the SCA administration are preempted by ERISA, the Seventh Circuit has recognized a cause of action under ERISA against non-fiduciaries who participated or conspired with an ERISA fiduciary to breach fiduciary duties owed the beneficiary. *Thornton v. Evans*, 692 F.2d 1064, 1078 (7th Cir.1982); *see also Whitfield v. Lindemann*, 853 F.2d 1298, 1303 (5th Cir.1988), *cert. denied*, 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989); *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir.1988); *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209,

1220–21 (2nd Cir.1987); *Fink v. National Sav. & Trust Co.,* 772 F.2d 951, 958 (D.C.Cir.1985) (dicta); *but see Nieto v. Ecker,* 845 F.2d 868, 871 (9th Cir.1988) (no cause of action against non-fiduciaries exists under ERISA).

 Grun has limned a grievance and has demanded relief; to the extent ERISA permits a cause of action against non-fiduciary third parties, Grun's Count II is not preempted. The relief sought by Grun's second cause of action, however, is punitive damages. The Supreme Court has held that §§ 409 and 502(a)(2) of ERISA do not provide for the recovery of punitive damages in suits brought by an individual beneficiary against a fiduciary. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985); *see also Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1216 (8th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981) (award of punitive damages inappropriate where fiduciary duty breached). Furthermore, principles of trust law are appropriately factored into ERISA to develop a federal common law of employee benefit plans where to do so is not inconsistent with the legislative scheme (*See Russell,* 473 U.S. at 148, 105 S.Ct. at 3093), and under the law of trusts, punitive damages are generally not recoverable from trustees for breach of fiduciary duty. *Kleinhans v. Lisle Sav. Profit Sharing Trust,* 810 F.2d 618, 626–7 (7th Cir.1987). Congress recognized that the courts, in interpreting ERISA, would need to develop a body of federal common law to address the issues raised under the statute, and as a matter of federal common law, an award of punitive damages is inappropriate to a claim of interference with employee benefit plans. Accordingly, with regard to Grun's second count, the defendants' motion for summary judgment is granted.

 With regard to Grun's third and final claim, the Magistrate Judge found that the defendants had not shown, based on undisputed facts, that there was an absence of evidence to support Grun's case. Accordingly, the Magistrate Judge did not recommend the entry of summary judg-ment in favor of the defendants. The court has completely reviewed the Magistrate Judge's recommendation with respect to Count III and finds it to be thorough, accurate, and the decision proper. Accordingly, the Court adopts and incorporates, pursuant to 28 U.S.C. § 636(b)(1), this portion of Magistrate Judge Lefkow's Report and Recommendation, denying defendants' motion for summary judgment as to Count III.

## CONCLUSION

The court adopts in part and incorporates Magistrate Judge Lefkow's Report and Recommendation, as modified herein, and thereby denies Grun's motion for summary judgment with respect to Count I of his complaint, grants defendants' motion for summary judgment with respect to Count II of Grun's complaint, and denies defendants' motion for summary judgment with respect to Counts I and III of Grun's complaint.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

LEFKOW, United States Magistrate Judge:

Plaintiff, William F. Grun ("Grun"), seeks to recover monies allegedly due under a Severance Compensation Agreement ("SCA") that he had with defendant, Pneumo Abex Corporation ("Pneumo Abex"). Grun also seeks recovery from defendants, PA Holdings Corporation ("PA Holdings") and The Henley Group ("Henley"), based on their alleged interference with the contractual relations created by the SCA.

Counts I and III of Grun's three-count complaint are directed against Pneumo Abex. The first count alleges that Pneumo Abex breached the SCA into which it entered with Grun. In Count III, Grun claims that Pneumo Abex also breached a NWL executive bonus plan. Count II, directed against PA Holdings and Henley, sets forth Grun's claim for intentional interference with contractual relations.

Grun and Pneumo Abex have filed cross motions for summary judgment with re-

spect to Count I of the complaint. Additionally, the defendants seek summary judgment with respect to Counts II and III to the extent that they are directed against each of them. Jurisdiction of this court is authorized at 28 U.S.C. § 1332. Venue, being uncontested, is proper in that a substantial part of the events giving rise to the claims occurred within the Northern District of Illinois. Additionally, Pneumo Abex's corporate office is located within this district. 28 U.S.C. § 1391.

## PROCEDURE ON SUMMARY JUDGMENT

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions and affidavits that are part of the record. Fed. R.Civ.P. 56, Notes of Advisory Committee on Rules. The initial burden of proving there is no genuine issue of material fact is on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To discharge this initial burden, the moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2553. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. A material fact must be outcome determinative under the governing law. *Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), the non-moving party's evidence is to be believed and all reasonable inferences from the facts must be viewed in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986);

*Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984).

## FACTS

In January, 1986, Grun became president and general manager of NWL Control Systems ("NWL"), a division of Pneumo Abex that was engaged in the manufacture of flight controls. His office was located at NWL's headquarters in Kalamazoo, Michigan. Pneumo Abex was headquartered in Boston, Massachusetts.

In 1987, Pneumo Abex's parent company, IC Industries, Inc., decided to offer Pneumo Abex for sale. As a result, Pneumo Abex entered into a number of severance compensation agreements with key corporate officers. The SCAs had three stated purposes: to encourage the executives' continued attention and undistracted dedication to their duties during the potentially disturbing and unsettled circumstances surrounding the possible change in the control of Pneumo Abex, to provide the executives with a degree of personal financial security and to induce the executives to remain in the employ of the company. In October, 1987, Grun and Norman J. Ryker, as president and chief executive officer of Pneumo Abex, entered into the SCA at issue herein. According to defendants, the terms of Grun's SCA were identical, or virtually so, to the SCAs given to Pneumo Abex's other key executives. Grun does not dispute this fact. Essentially, the SCA provided that Grun would be entitled to severance compensation, calculated in accordance with the SCA, if he terminated his employment for any one of several "good reasons" set forth in the SCA within two years after a change in control of Pneumo Abex. Five of the several "good reasons" set forth in the SCA are of particular interest to this litigation:

(1) "the assignment to the Executive ... of any duties inconsistent with, or a diminution of, the Executive's position, duties, titles, offices, responsibilities and status with the company ... immediately prior to the change in control...." SCA, ¶ 3(e)(i);

(2) "any failure by the Company ... to continue in effect or make provision for any incentive plan or arrangement ... in which the Executive is participating at the time of a Change in Control of the Company (or to substitute and continue other plans ... providing the Executive with substantially similar benefits)...." SCA, ¶ 3(e)(iv);

(3) "any failure by the Company ... to continue in effect or make provision for any plan or arrangement to receive securities of [IC Industries, Inc.] (including, without limitation, the 1982 Stock Option, Restricted Stock Award and Performance Award Plan ...) in which the Executive is participating at the time of Change in Control of the Company (or to substitute and continue plans ... providing the Executive with substantially similar benefits)...." SCA, ¶ 3(e)(v).

(4) "a relocation of the Company's principal executive offices or the Executive's relocation to any place other than the location at which the Executive performed the Executive's duties prior to a Change in Control of the Company." SCA, ¶ 3(e)(vi); and

(5) "a substantial increase in business travel obligations over such obligations as they existed at the time of a Change in Control of the Company." SCA, ¶ 3(e)(vii)."

Approximately five months after Grun's SCA was executed, Mr. Ryker wrote to Grun apparently to explain the purpose of the SCA.[1] Mr. Ryker stated that the SCA was to provide Grun with certain protection if a change of control occurred and Grun's position or compensation was substantially adversely affected. Mr. Ryker identified a change in the location of Grun's place of work as a potential adverse effect, but went on to state:

For holders of severance compensation agreements who do not work at the Company's headquarters, a relocation of its

principal executive offices is not an adverse event. Inasmuch as you do not work at the Company's headquarters, this letter is to advise you that the Company did not intend for you to become entitled to termination compensation under Section 3(e)(vi) of the Agreement by virtue of the relocation of the Company's principal executive offices *unless* there is also a relocation of *your present* office.

On April 5, 1988, Grun responded to Ryker's letter advising that,

I cannot agree with the interpretation of the Severance Compensation Agreement which is contained in your letter of 3/25/88. My family and I consider a change in the location of the principal executive offices from the Boston area, which we consider to be our home, as one of the potential adverse effects of a change in control of the Company.

In late April, 1988, IC Industries, Inc. announced that it had signed a letter of intent with PA Holdings, a holding company jointly owned by Henley and Wasserstein, Perella & Co., regarding the purchase of Pneumo Abex. On August 30, 1988, the deal was consummated and PA Holdings purchased 100 percent of Pneumo Abex's stock from IC Industries, Inc. This sale/purchase of Pneumo Abex constitutes a "change in control" within the meaning of the SCA.

Upon completion of the sale, PA Holdings, for all intents and purposes, became Pneumo Abex.[2] Initially, the owners of PA Holdings intended to sell the various component divisions of Pneumo Abex. They advised Grun that NWL was one of the divisions targeted for sale, but requested that Grun remain at NWL and Pneumo Abex through the date of sale. Grun agreed to do so. After attempts to sell the individual divisions were unsuccessful, Henley decided, in early 1989, that it would run Pneumo Abex as an on-going concern. Because Wasserstein, Perella did not wish

---

1. There is nothing in the record to illuminate what prompted Mr. Ryker to write this March 25, 1988 letter. It is worth noting, however, that the letter was written just one month prior

to the announcement that an agreement for the sale of Pneumo Abex had been reached.

2. In fact, PA Holdings has now been renamed Pneumo Abex Corporation.

to operate Pneumo Abex on a long term basis, an agreement was negotiated whereby Henley would purchase Wasserstein, Perella & Co.'s interest in PA Holdings. This buy-out was completed in May, 1989. After Henley purchased Wasserstein, Perella's equity interest in PA Holdings, NWL was taken off the market.

In April, 1989, Ralph Stewart became president and chief executive officer of PA Holdings. In June, Mr. Stewart announced that the various corporate functions, formerly handled at Pneumo Abex's corporate headquarters in Boston, Massachusetts, would be divided among several offices: the consolidation, tax and treasury functions were merged into the Henley headquarters operations in Hampton, New Hampshire; the legal and security functions remained in the Boston area but moved outside the city to Newton, Massachusetts; the human resource/benefits functions were absorbed into the various operating divisions; and, a corporate office was established in the Chicago area.[3] The Boston office was ultimately closed in September or October, 1989.

Mr. Stewart also determined early on that he wanted to negotiate an end to all outstanding SCAs so he could develop a new management team of people who intended to continue on with the corporation. During the summer of 1989, Mr. Stewart communicated both verbally and in writing with the various individuals who had SCAs. On July 25, 1989, Mr. Stewart sent Grun a letter proposing a buy-out of Grun's SCA. Grun declined the offer at a meeting held at PA Holdings' Chicago area corporate offices. The day after Grun's rejection, Mr. Stewart telephoned Grun and asked him to consider a revised offer and Grun indicated that he would. On August 23, 1989, Stewart met with Grun and presented a revised offer which Grun again declined. In a letter dated August 31, 1989, Grun submitted his letter of resignation requesting that he be paid in accordance with his SCA.

Approximately one week later, Thomas Rea, director of Human Resources for Henley, who also served as an assistant to Stewart, wrote to Grun requesting a clarification concerning Grun's "good reasons" under the SCA for leaving Pneumo Abex. On September 11, 1989, Grun replied and identified five "good reasons" for terminating his employment:

(1) the diminution of his position, duties, titles, offices, responsibilities and status;

(2) the failure to provide a substantially similar substitute for IC Industries' Long Term Incentive Performance Plan;

(3) the failure to provide a substantially similar substitute for the IC Industries' 1982 Stock Option, Restricted Stock Award and Performance Award Plan;

(4) the relocation of the company's principal executive office outside of Boston, Massachusetts; and

(5) the substantial increase in his travel obligations.

Over the next month, Grun and Rea discussed Grun's entitlement to severance compensation on several occasions. On September 26, 1989, however, Rea notified Grun that PA Holdings had determined that Grun was not entitled to compensation under the SCA because he did not have "good reason" to terminate his employment. After a final meeting on October 9, 1989 where it became clear that no resolution could be reached, Rea wrote to Grun and informed him that his employment with Pneumo Abex would be terminated as of October 15, 1989.

Count III of plaintiff's complaint arises out of an alleged breach of an executive bonus plan entitled "NWL Control Systems 1989 Management Incentive Compensation Plan" ("Incentive plan"), which is entirely separate from the SCA discussed above. Additional facts relating to the Incentive plan are as follows:

**3.** As the various moves began to take shape, Mr. Stewart began to operate out of the corporate office in Burr Ridge, Illinois.

The Incentive plan became effective on January 1, 1989 and remained in effect during the next six months. On June 30, 1989, PA Holdings terminated the Incentive plan and replaced it with another incentive program. In their Amended Answer to Grun's complaint, defendants admit that Grun participated in the Incentive plan during the first half of 1989.

After the plan was discontinued, Grun, as administrator for the Incentive plan, wrote to Mr. Stewart and reported amounts of awards earned by each participant during the first six months of 1989. Grun further advised Mr. Stewart that payments of these earned amounts would be made "as soon as practicable after the close of the fiscal year in accordance with the terms of the plan." This memorandum identified Grun as a participant in the Incentive plan and indicated that he had earned $68,553.

On March 5, 1990, Mr. Rea sent Grun a check in the amount of $50,000 which was designated as Grun's "1989 pro-rata discretionary incentive award." After receiving the check, Grun wrote to Mr. Rea to inform him that his bonus award under the Incentive plan should have been $68,553. He noted the $18,553 discrepancy between what he had earned and the discretionary incentive award he had received. Grun asked Mr. Rea to ensure that no inadvertent error had been made in the amount of his award. The record before this court does not contain any response to Mr. Grun's March 7, 1990 letter. He has never received any additional monies attributable to the Incentive plan.

Defendants assert that Grun is not entitled to any award under the Incentive plan because "when Grun was promoted [in May, 1989], he was informed by Stewart that he was being taken off the [Incentive plan] and being placed on the more lucrative PA Holdings Key Employee Incentive Plan." Defendants' Memorandum of Law in Support of its [sic] Motion for Summary Judgment at 14. Their evidentiary support for this assertion includes: (1) deposition testimony by Mr. Stewart that Grun participated in the Incentive plan until he was promoted and that he (Stewart) did not know whether Grun participated in it thereafter (Stewart Dep. at 112–15); (2) deposition testimony by Mr. Rea that Grun did not participate in a plan known as the PA Holdings Incentive Compensation Plan [which was effective as of July 1, 1989], but that he did participate in a "Corporate Cash Flow Plan" (Rea Dep. at 153). The record also contains some evidence which appears to contradict the defendants assertions; for example, Mr. Rea testified that "Mr. Grun didn't participate or wasn't due to participate in the Key Employee Incentive Plan." (Rea Dep. at 145).

## DISCUSSION

In support of his motion for summary judgment, Grun argues that all events necessary to trigger his right to receive severance compensation under ¶ 3(e)(vi) of the SCA have occurred. In response to Grun's motion and in support of its own motion for summary judgment, Pneumo Abex contends that Grun has interpreted ¶ 3(e)(vi) incorrectly and that the preconditions set forth in that paragraph have not been satisfied. Pnemo Abex further asserts that none of the five "good reasons" that Grun provided as the bases for terminating his employment is supported by the record.

Defendants also move for summary judgment with respect to Counts II and III of Grun's complaint. Defendants first argue that Count II is preempted by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* They maintain, however, that even if Count II is not preempted, the undisputed facts establish that plaintiff cannot prevail on the merits of either Count II or III. Plaintiff responds that Count II is not preempted by ERISA and that genuine issues of material fact prevent the entry of summary judgment in defendants' favor as to either Count II or III.

The motions with respect to each count of the complaint will be discussed separately below. As a preliminary matter, however, it is necessary to consider whether ERISA governs the application of the SCA, as defendants claim. Grun argues that the

**642**

SCA is nothing more than an individual employment contract, not an ERISA plan.

## I. *Applicability of ERISA*

Whether the SCA is governed by ERISA turns on whether it constitutes an "employee benefit plan" within the meaning of the statute. Although a contract which provides for the payment of compensation to an employee terminated after a corporate change of control provides a type of benefit covered by ERISA, *Purser v. Enron Corp.*, No. 88–1117, 1988 WL 220238, at *3, 1988 U.S.Dist.LEXIS 15516, at *3 (W.D.Pa. Dec. 5, 1988), the fact that the SCA involves an employee benefit does not mean that it is part of an employee benefit *plan.* *See Fort Halifax Packing Company v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). In *Fort Halifax,* the Court held that ERISA did not preempt a Maine statute requiring employers to provide one-time severance payments to workers if the employer decided to close its plant, or relocate it more than 100 miles away, because the statute did not create an employee benefit "plan." *Id.* The Court noted that ERISA's legislative history shows that Congress chose to use the term "employee benefit *plan* " in recognition of the additional concerns that arise from administering a plan, including the need for a system to determine the eligibility of the claimants, to calculate benefit levels, to make disbursements and to monitor the availability of funds for benefit payments. *Id.* at 9, 107 S.Ct. at 2216. In determining that the Maine statute did not create an ERISA plan, the Court found it significant that the statute required no more than a one-time lump sum payment triggered by a single event that might never occur and therefore no administrative scheme whatsoever was necessary to meet the employer's obligation. *Id.* at 12, 107 S.Ct. at 2218. In other words, if the employer decided to close its plant, its one-time statutory obligation to pay benefits to all its employees required no administrative scheme on the part of the company; it merely had to write the checks. The Court contrasted a situation where an employer had made a commitment to pay severance benefits to em-

ployees as each person left employment. *See Id.* at 17–18, 107 S.Ct. at 2220–21, *distinguishing, Holland v. Burlington Industries, Inc.,* 772 F.2d 1140 (4th Cir.1985). The Court noted that, in *Holland,* there was no question that a plan was in existence because an administrative scheme was required to make decisions on employee eligibility, benefit levels and payment schedules. *Fort Halifax,* 482 U.S. at 17–18, 107 S.Ct. at 2220–21.

The present case is similarly distinguishable from *Fort Halifax.* Although the SCA, from Grun's perspective, would provide a one-time severance payment upon the occurrence of certain events, it was clearly necessary for Pneumo Abex to anticipate the need to make payments under all of its SCAs on a more on-going basis. The record establishes that the company had entered into virtually identical agreements with a large number of employees pending the potential change in control. Moreover, because the SCAs obligated Pneumo Abex to pay severance compensation upon the occurrence of any one of a number of events, some type of administrative scheme was necessary to determine each employee's eligibility for benefits based on the circumstances of their termination.

Grun's reliance on a recent Fifth Circuit decision to argue that golden parachute agreements are not employee benefit plans is unpersuasive. *See Fontenot v. NL Industries, Inc.,* 953 F.2d 960 (5th Cir.1992). In *Fontenot,* the Fifth Circuit found no meaningful basis to distinguish a "plan" created by a golden parachute agreement that was provided to a limited number of executives from the "plan" at issue in *Fort Halifax. Id.* at 962. The court noted that the severance plan at issue therein required no administrative scheme because the employees included in the plan were to receive benefits upon termination regardless of the reason for termination. *Id.* at 963. By contrast, severance agreements necessitating an analysis of the circumstances of each employee's termination in light of eligibility criteria did require an administrative scheme and therefore fell within the

definition of an ERISA employee benefit plan. *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3rd Cir.1989). Because the SCA more closely resembles the severance agreement at issue in *Pane* then the agreements at issue in *Fort Halifax* and *Fontenot*, it constitutes an employee benefit plan, the application and interpretation of which is governed by ERISA.

## II. *Count I*

With respect to Count I, the parties agree that a change of control, as contemplated by the SCA, occurred in August, 1989. Additionally, there is no dispute that Pneumo Abex's executive offices in Boston, Massachusetts were closed in fall of 1989. Although the various functions of the executive offices were not all relocated to the same place, all functional areas were all relocated outside of Boston. The parties' disagreement, then, is limited to whether ¶ 3(e)(vi) of the SCA was intended to trigger entitlement to severance compensation absent any relocation of the office where Grun worked. Grun argues that the relocation of either his own office *or* the Boston executive offices prompted his right to compensation under ¶ 3(e)(vi). Pneumo Abex, by contrast, contends that the clear intent of the parties was to trigger compensation *only* in the event that Grun's own office was relocated.

Initially, the parties dispute whether the SCA's Delaware choice of law provision or the federal common law rules of contract interpretation governing ERISA plans should control. Because the contract principles at issue are so universal and well established, there is little point to lengthy debate over which law applies. In light of the above determination that the SCA was an ERISA plan, however, federal common law will take precedence over the state law of Delaware. *See Hammond v. Fidelity and Guaranty Life Insurance Company*, 965 F.2d 428, 430 (7th Cir.1992).

In construing a contract, the overriding purpose is give effect to the parties' mutual intent at the time the contract was made. *Alliance to End Repression v. Chicago*, 742 F.2d 1007 (7th Cir.1984). *See also White v. Roughton*, 689 F.2d 118, 120 (7th Cir.1982). In undertaking this task, the terms of the SCA must be interpreted in their ordinary and popular sense. *Hammond*, 965 F.2d at 430. However, even plain language should be read in context so as to give effect to the parties' joint purpose as it is embodied in the language of the contract. *White*, 689 F.2d at 119–20. In other words, the various contract provisions must be considered as a whole because words derive meaning from the context in which they occur. Finally, in choosing among the reasonable meanings of a promise, the language should be construed against the drafter of the instrument. Restatement (Second) of Contracts, § 206 (1981). This rule of construction is justified because the drafter is more likely to have reason to know of uncertainties of meaning and may well use obscure language deliberately, intending to decide later which meaning suits his/her purposes. *Id.* comment a.

In applying these principles to the SCA, it is apparent that the intention of the parties, *at the time the contract was made*, was to allow Grun to recover under the SCA if he terminated his employment within two years following a change in control and either Pneumo Abex's principal executive offices were relocated out of Boston, Massachusetts *or* his own place of work was relocated. The plain language of ¶ 3(e)(vi), when all of its words are taken in their ordinary sense, evidences this intention. To accept the defendants' interpretation of ¶ 3(e)(vi) would require the court to ignore the first half of the paragraph. This, the court cannot do, especially in light of the rule which requires the court to construe the contract against the drafting party.[4]

---

4. It is apparent from the record that Pneumo Abex was the drafter of the SCA. First, there is no dispute that Grun's SCA was identical to the SCAs that Pneumo Abex offered to all of its key executives. This is a strong indication that

Pneumo Abex drafted one standard SCA which it then offered to the executives that it hoped to keep on board during the change in control. There is nothing in the record to indicate that individualized negotiation of the SCA terms was

The defendants' reliance on *White v. Roughton*, does not compel a different conclusion. In *White*, the Seventh Circuit interpreted a federal consent decree pursuant to which a township was required to establish certain guidelines and procedures for the purposes of evaluating eligibility for welfare benefits. One clause of the decree seemed to establish a substantive entitlement to emergency assistance which, the plaintiffs claimed, was violated when the township repealed an ordinance providing for emergency assistance. In finding that the repeal of the emergency assistance ordinance was not a violation of the decree, the court relied on the fact that the language which appeared to grant a *substantive* entitlement to emergency assistance was inconsistent with the stated purpose of the consent decree; namely, to ensure the protection of certain constitutional *procedural* rights. *White*, 689 F.2d at 121. Thus, the context and the apparent purpose of the consent decree established that the literal meaning of the clause at issue was not what the parties intended. *Id.*

Unlike *White*, the interpretation of the SCA favored by Grun is entirely consistent with the SCA's stated purposes. Those purposes include: encouraging Grun's disinterested attention and undistracted dedication to his duties; providing Grun with some degree of personal financial security; and, inducing Grun to remain in the employ of the company. Indeed, it is the defendants' interpretation which is contrary to these purposes. If the trigger for severance compensation under ¶ 3(e)(vi) was limited to the relocation of Grun's own workplace, it would have reduced the number of situations under which Grun could have benefitted from the SCA, thereby providing him with less financial security, less incentive to remain in the employ of Pneumo Abex and less reason to remain interested in his duties. Moreover, if Pneumo Abex had desired to limit the SCA's application as it now claims, it would have been relatively simple for it, as drafter of the agreement, to leave out the first clause of ¶ 3(e)(vi). The court must presume that it

included that first clause in Grun's SCA for a purpose.

Finally, the defendants' reliance on Mr. Ryker's March 25, 1988 letter as evidence of the intent of the parties in entering into the SCA is unpersuasive. This after-the-fact attempt to limit the application of the SCA appears to have been prompted by the negotiations for the sale of Pneumo Abex to PA Holdings. It carries little weight as evidence of what the parties intended *at the time the contract was made* and tries to impose restrictions which are not evident from the SCA's language, its stated purposes or the context in which it was made. In effect, Mr. Ryker's letter is an attempted subsequent modification of the SCA which Mr. Grun promptly rejected.

The undisputed facts of this case establish that all the events necessary to establish Grun's right to recover severance compensation under ¶ 3(e)(vi) of the SCA have come to pass. Accordingly, summary judgment should be entered in favor of Grun and against Pneumo Abex as to Count I of the complaint. In light of this outcome, it is unnecessary to consider the remaining issues that defendants' motion for summary judgment raised with respect to Count I.

### III. *Count II*

In support of their motion for summary judgment on Count II, PA Holdings and Henley argue, first, that Grun's state law claim of intentional interference with contractual relations is preempted by ERISA. They further maintain that, absent preemption, the undisputed facts establish that no intentional interference with contractual relations occurred. Grun counters that the defendants waived their right to assert ERISA preemption by failing to raise it as an affirmative defense in answering the complaint. He also argues that there are issues of material fact which preclude the entry of summary judgment in favor of the defendants.

permitted. Additionally, the evidence shows that Mr. Ryker simply forwarded the change of

control agreement to Grun and asked him to sign and return it.

At the time defendants filed their final brief in support of their motion for summary judgment, they also moved for leave to amend their answer to Grun's complaint. I granted defendants' motion for leave to amend their answer on April 21, 1992. The amended answer, which raises ERISA preemption as an affirmative defense, was filed on May 5, 1992. As a result, Grun's waiver argument is no longer applicable.

As discussed above, the SCA constitutes an "employee benefit plan" within the meaning of ERISA. ERISA explicitly states that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The courts have recognized that this preemption clause is "conspicuous for its breadth." *FMC Corporation v. Holliday*, 498 U.S. 52, 59, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). Whether a state law "relates" to such a plan includes any law which has a connection with or reference to an employee benefit plan. *See Id.* 498 U.S. at 61, 111 S.Ct. at 408–409. In essence, the inquiry is whether the conduct challenged by the state law claim was part of the administration of an employee benefit plan. *Scott v. Gulf Oil Corporation*, 754 F.2d 1499, 1505 (9th Cir.1985). Under these standards, the allegations of Count II, which claim that PA Holdings and Henley engaged in conduct which interfered with Grun's ability to receive compensation under the SCA, clearly have a connection to an ERISA plan. *See generally Pane*, 868 F.2d at 635 (claim of intentional infliction of emotional distress by refusing to grant severance benefits is preempted by ERISA). Because Count II is preempted by ERISA, summary judgment should be entered in favor of defendants and against plaintiff with respect to this count.

### IV. *Count III*

■ Defendants argue that they are entitled to summary judgment on Count III because the undisputed facts establish that Grun was removed from participation in the Incentive plan in May, 1989 when Mr. Stewart promoted him. Therefore, they argue that Grun is not entitled to receive any benefits under the Incentive plan. They assert that the $50,000 payment to Grun in March, 1990 was simply a discretionary payment in recognition of Grun's valuable services.

In response, Grun contends that the defendants have conceded that he was a proper participant in the Incentive plan during the first six months of 1989. He argues, therefore, that disputed issues of fact remain regarding his entitlement to benefits under the plan.

Despite the defendants' implied representation that Grun did not participate in the Incentive plan subsequent to his promotion in May, 1989, the evidentiary record does not support this contention. The defendants principally rely on the deposition testimony of Mr. Stewart to support their contention. Mr. Stewart, however, merely testified that Grun participated in the Incentive plan prior to his promotion and that he (Mr. Stewart) did not know whether Grun participated in the plan after the promotion. Defendants cite to nothing in the record which states that Grun did not participate in the Incentive plan after his promotion. Moreover, as Grun points out, the defendants admitted the allegation that Grun "properly participated" in the Incentive plan between January 1 and June 30, 1989. Amended Answer, ¶ 55. Thus, defendants' "proof" that Grun was not entitled to benefits under the Incentive plan is questionable at best. Even if he was removed from the plan in May, 1989, a question would remain as to Grun's right to recover any benefits accrued to him during the five months when we was a participant of the plan.

Defendants simply have not shown that, based on the undisputed facts, there is an absence of evidence to support Grun's case with respect to Count III. Accordingly, the entry of summary judgment in favor of defendants would be inappropriate.

### RECOMMENDATION

For the reasons stated above, it is recommended that plaintiff's motion for summary judgment with respect to Count I of

the complaint be granted and that defendants' motion for summary judgment be denied with respect to Counts I and III and granted with respect to Count II.

Written objection to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Charles R. Norgle, Sr. within ten days after service of this Report and Recommendation. *See* Fed.R.Civ.P. 72(b). Failure to object will waive any such issue on appeal.

Dated: October 1, 1992